Thank you, Your Honor. May it please the Court, Michael Hugo from Framingham, Massachusetts, arguing on behalf of the Plaintiff of Pellons. Before I begin the argument, I'd like to introduce you to Christopher Nace, who is my co-counsel from Washington, D.C. and inform the Court that we have several families here who have been affected by this, including losing children as recently as a couple of months ago and siblings and spouses and parents, including one gentleman here who lost his wife and his 28-year-old daughter, who is a mother of two. She passed away. This case, really, there's been a lot of to-do made of the Waverly View case, which was a very similar factual case, handled by the same judge as this one. I want to draw the Court's attention initially to the fact that the Waverly View case, when it was dismissed by the judge, was never taken up on appeal and instead was filed in the court of appeals. But it's just about parallel to our recent Wood case. Yes, it's got some similarities there, too, certainly. So to begin with, I'd like to say that the standards that the defense has been relying upon from going back as far as the 1955 use of the TCE and PCE, which does not include any discussion of the anthrax, smallpox, dioxin, etc., that were buried in the same area, that the cleanup began in this messed-up site. Around 1970, 1974, they put in some monitoring wells. Up until that point, they had been, since the mid-50s, merely dumping all of these volatile organic compounds, infectious products, and things of the sort. Could you help me out? I know there's a long history here, and a lot of it is really background. Because what we have to focus on, I think, is the conduct that you're challenging, the federal conduct. Yes. And best as I could read is you're challenging a negligent disposal of toxins and similar things, and the negligent remediation. Is that it, or is there something else? That really puts it right in front of you. How about the negligent warning? There was definitely a failure to warn anybody. Are you alleging that? Yes, we are. All right, so you're alleging that there was a negligent disposal of these beginning in 1943, and a negligent failure to warn the public about them? That's correct. The government took no steps. Of course they wouldn't. This is a war activity, right? A hot war, a Second World War, and a cold war. At that time. At that time, up until the change in public policy in 1969. Correct. Right? Correct, yes. And then there was a negligent remedial effort. Yes. Okay, now, all of those were major policy considerations for the government to carry out. One was the development of weapons for war and combat and protection of the nation. The second failure to warn was a judgment call in order to protect the secrecy of that. And the third, the remediation, was a determination of what's best to do at this point in time, right? That had done many things, and they took a course of action, and you're challenging that, but if you follow what Judge Blake said, which I think is consistent with Berkowitz, and with our recent decision in Wood, it seems to me they had choices to make. They had carrying out policy, and all of that is the type of conduct that we usually consider part of the discretionary function of government. But you can address these. This is just my concern, but I think it's helpful to focus on the conduct that you're challenging. Sure. I think we've reached some agreement on what that is. Okay. So I will go to your first concern, which was the initial hot war issue of World War II and the Korean War and the Vietnam War. And there was a war situation going on. Nobody knew what was going on on that base. It was the Testing Center for Biological and Chemical Warfare, so they weren't about to start telling people what they're doing. However, at some point there was no war. What's that point, 1969? I would say Vietnam War was still going on then. It was running until the mid-'70s. So when do you pinpoint that? Well, I would pinpoint it at the end of when President Nixon said there will be no more biological chemical warfare. That was 1969. That was 1969. That's what I thought. So it shouldn't be. There should be no secrecy for purposes of defense, for purposes of the military operation from that point on. When we say there are no more nuclear weapons, we have to then disclose to the public all our nuclear waste sites and all the nuclear efforts and the nuclear secrets we have? I would say if there were no more nuclear weapons, the government certainly should be telling people that you're living on top of a nuclear dump site. Absolutely. Well, they're not living on top of it. Or right next door to it. Absolutely. There would be a duty at that point. And there was no secrecy in what was going on once they stopped making weapons on that property. There was continued disregard for responsible cleanup standards. Well, we're assuming they were negligent according to your statement, but the question is I'm not sure what the negligence was at the point. These were public policy decisions reflecting the cleanup after a development or arms of war. And now we're faced with an area of Maryland, Frederick County, which has been contaminated by disposal over many, many years. And the government now decides to clean it up and to try to remediate it. And they could have done many, many things, but the question is, is what they did something that we hold them responsible for when they've made a judgment call as to what to do in carrying out a public policy? The fine hair here that I'm going to split is the obligation of the EPA versus the obligation of the Defense Department. You have the EPA, which under the CERCLA regulations, the CERCLA regulations say that this is a discretionary function. But that runs for the EPA. We haven't sued the EPA here for that reason. If they decide to regulate it… You sued the government. That's what the Tort Claims Act did. Right, but the branch of the government that we're… But you're suing the United States of America in the tort claim. Absolutely. And the waiver of sovereign immunity has an exception that's called the discretionary function doctrine. Correct. And that's what they assert. That's where we are. That's where we are right now. That's why we're standing here. They say it's a discretionary function, and you're focusing on the remediation and failure to warrant. That's correct. That's correct. The question is whether that discretionary function doctrine is a bar to this claim. That's correct. And Judge Blake said it was. And she did. That's where we are. And that's why we're standing here. Okay. So, that said, the policy originally that came from President Nixon, and then which was repeated, and I'll just point you to pages 30 through 37 of the plaintiff's opening brief, where we list out Army Regulation 200-1, Part 650, the Federal Register… 77 Federal Register site that's in there. The site management plan. Even the Fort Detrick Regulation 385-1, which goes back to 1969, talks about we're going to clean it up, and this is what we're going to do, and this is what everybody's responsibility is. The government's thought about this a lot. Yeah, they've thought about it. They've thought about it, and they've made decisions about it. Well, they didn't make a lot of decisions. They've made decisions. They've thought about it. You don't like the decisions, but they've thought about it, and they've made decisions. You're saying their decisions were just wrong. No, I'm not even giving them that much credit. You're not giving me credit at all. I'm saying that they made no decisions once they decided to cap that piece of property. They wouldn't have to make any decision. They could have left it there and not be suable. That would have been a decision. They would have said, we're going to leave it there. It's contained enough. That's the risks of developing a defense system, and they could have made that judgment call, and you couldn't have sued them. I'm not sure that we couldn't have sued them under that circumstance. I think that with the warning aspect of it, I think that they're open. They're open game on that. They took steps that were – if this was – if I was standing here talking to you about BP, Dow Chemical, BASF, one of the big chemical companies, and they didn't do a good enough job of cleaning up their property or the Gulf of Mexico, if I was arguing that in front of you, I would say that the EPA gave a regulation, which they have – which the EPA itself has immunity from, but the actions of the corporate defendants were irresponsible. And in this case, there's a direct analogy. We're not arguing whether it's responsible or not. We're arguing whether it was a judgment call, whether the government made a judgment call and had a choice. And we don't challenge the judgment calls, or we wouldn't have a government because every action of government at the policy level is a judgment call, and the Congress has chosen not to waive sovereign immunity for those types of calls. Once they undertook the act, they did everything wrong from the point that they started to undertake the act to clean the property up. They removed a piece of it. They removed parts of the – But weren't those judgments? I mean, they could have decided to do – they could have decided to go an entirely different course.  Or when they are remediating chromium in the Inner Harbor, they built a case, a concrete case going 70 feet into the ground to encapsulate the soil. Well, that's a choice, and if that happens to leak or fail and there was a government action, it seems to me the government has chosen not to be liable for that. Here they chose to take certain actions. I'm not sure what all the actions were, but I think it's immaterial. The fact is there were many, many possibilities and choices, and you're arguing that the choices they made were not the right ones. The choices that they made were totally ineffective. That's why we have people here in this courtroom that have lost family members. That's a pretty major leap to give the government carte blanche on that. When they undertook to – When you're talking about carte blanche, we're talking about whether the government has chosen to be sued on this. In other words, the question is whether you can look to the government and hold it responsible for bad policy decisions. And Congress has said that is not the type of thing we are going to allow private citizens to sue the government for. And that's the conclusion with the analysis of Berkowitz that Judge Blake came to. In reviewing all the regulations and all the decisions, she said these were choices, these were judgment calls. And we don't hold people or the government responsible. Well, it's not we who don't. The government chooses not to be held responsible for its judgment calls. Isn't that what the Tort Claims Act is all about? Well, that's what the Tort Claims Act is all about. But that – the exception, the discretionary function exception that's being invoked by the government here doesn't apply here. Because once there was a directive, there came a series of directives. There were many directives. It started with Nixon and it went through various task forces in the early 80s into the early 90s and up to the late 90s when they started doing the capping and all of that. Those were – they weren't really government choices. They were mandated that they do it. And then they did it wrong. And once they've gone wrong, then that's not a policy choice at that point. What they did wrong was not the result of a policy choice. What they did wrong was pure negligence, not warning people, not doing the act and what they've begun to undertake properly. And we're stuck today with people who are continuing. Up to this day, there are people – one of the gentlemen in this courtroom right now has got surgical staples in his gut from a procedure he just underwent before he came here. And this is going on and on and on, and the government has just stopped doing anything. They've said we've capped it, it's good enough for us, and if people die, they die. They're not doing anything on that base today. They're not building weapons anymore. There's nothing secret going on on that base anymore. In fact, the base is being used for medical research today. There are drug companies that are in and out of that base all day long. There are private citizens going on and off that base all day long. And the government has just done nothing, nothing since 1997 when they just stopped. They just stopped. Okay. You have some rebuttal. I do. Thank you. Ms. Falk. Good morning. My name is Christina Falk. I represent the United States of America in this action, and also with me today is Sarah Williams, a trial attorney in the Department of Justice. I don't have too much to add. I would just like to clarify a few things. The first issue that was raised was whether or not the plaintiff had actually pleaded a failure in a warrant claim. Well, I appreciate the court's response. Maybe it didn't. It looks like the pleading may be in connection with tolling the limitations. Exactly. It appears to be more a tolling limitation. But it really doesn't matter a lot. They do argue there was a negligent disposal and a negligent remediation. Yes, I agree. And those were the issues that were briefed below, and those are the issues that we've addressed before the court. Very quickly, I would just like to mention that with regard to the disposal, the plaintiff has suggested that there was no discussion of any of the biologicals. I think it's really important to remember that in this situation, much like the Holbrook case where before you even get to the two-part test under Gobert where whether or not a regulation is mandatory and specific, and then the standard question is, was it within policy? This case, on the issue of the actual disposals for everything, is more like Holbrook. The language that appears before that Gobert test, the Supreme Court says, if there is a regulation that you followed, it is presumed that everything you've done is in furtherance of the policy. You're giving up a little bit too much because it seems to me if it's non-discretionary, if it's mandated and it's not discretionary, then they're going to be stuck unless the mandate is part of the policy. Yes, and in this instance, Your Honor. Well, I understand that, but it seems to me that comes directly out of Berkowitz, the two-step process. Yes, in this instance, however, Your Honor, the regulation that was in effect at the tail end of the disposals is for industrial, microbiological, and chemical waste, and it specifically told the Army at Fort Detrick to dispose of the waste in Area B. It also put pesticides and herbicides in Area B. They were told to do that, and there's even a policy reason for doing it. It was because they did not want any of that waste to leave the base. That's security-related and also concerns for safety. So they were specifically told that as late as 1969. The pits at issue operated only until the early 1970s. This appears about 1972. I don't quite understand how that advances your argument. I believe it advances our argument in that they were actually told to dispose of it there. As a matter of fact, Judge Blake pointed to that language in Galbert. When you're specifically told to perform conduct, that conduct then is well within the discretion that the policy has given them, the policy of operating the entire base. The plaintiffs have never pointed to a single mandatory and specific directive with regard to waste disposal policy that would have prescribed their conduct. We've indicated that actually the policy at the time was to bury it at Area B. With regard to the cleanup, the plaintiffs have suggested that the CIRCLA regulation somehow did not apply to the Army. We fully briefed that. If you look at our discussion of Executive Order 12580, under CIRCLA, CIRCLA was passed in 1980. The regulations that were adopted, what CIRCLA says is the President shall take all these actions. The President shall be engaged in cleanup, et cetera, et cetera. What that Executive Order does is it specifically, the President delegates that authority to the various federal agencies who act on behalf of the President. And 12580 gives the Army, the Army has delegated that responsibility for its own facilities. So the Army is acting in that capacity. The fact that the government was aware of the situation and cleaned it up in the sequencing that it did, is just immune with policy. I think the Daigle case from the 10th Circuit goes into great length about this, as well as the Horton case, a district court case here. Plaintiffs are suggesting that the Army hasn't been doing anything at this site. The Army has been actively cleaning up this site and spent millions of dollars, tens of millions of dollars, on the cleanup of this site. I would also like to note that there's been some suggestion that the Army's mission is not a significant mission. In fact, what the Army is doing, and has been, since we renounced the affirmative use of biological and chemical weapons, is to be developing, with private partnerships, as well as the National Institute of Cancer, antidotes and protective measures for our troops and our population in general. That is the mission of Fort Detrick, and it's carried quite well. I'd also like to note that under CERCLA, in this case, there's been an extensive public administrative record. Every exhibit that the United States relied on below, if you look at the declaration of Mr. Kondiger, who introduced these into evidence, it's at docket 20-3. Every exhibit that was used was part of the CERCLA administrative record, which is publicly available at the Frederick Library. There was nothing unique or unusual about the fact that we were filing this. The same exhibits were used in the Waverly View decision. Judge Blake's very well-reasoned Waverly View decision is consistent with about 10 other decisions on very similar conduct in district courts within this district, as well as to federal circuits. Within the CERCLA process, I'd also like to note that it's a good thing now that the site is on the NPL. As we mentioned at the tail end of our brief, there have been a number of health investigations. While none of them have found any links to cancers, those activities do exist and are available to the public to participate. Some of the plaintiffs in this case have attended the quarterly public meetings that occur for all the CERCLA decisions in this process. Those quarterly public meetings have been held since 1997. There have been 20 years of those quarterly public meetings where input is taken. If you look at every decision in the record regarding the cleanup, particularly the huge cleanup that occurred from 2001 to 2004, where the government, if you look at the documents that are presented, you see that the Army had to get the authorization of the state, the Maryland Department of Environment, and EPA, to perform the types of cleanup because it was a very tricky cleanup and involved unknown waste of unknown type because of the nature of the work there. So these things were all publicly vetted. The information has all been publicly available, and we would ask the court to affirm the district court's very well-reasoned decision. Thank you very much. Mr. Yugo. Thank you. At some point, judgment stopped and there became execution. And I think when I ended my principal argument, I was talking about how everything just stopped. Well, at the point where everything stopped, that's when judgment calls. That's where everything went out the window and there was nothing there. Now we're faced with years of no action whatsoever on the execution. The government's attorney just pointed out that there are quarterly public meetings going on since 1997. They're not anymore. Those meetings haven't taken place for at least the last year or two that I'm aware of. Our people attend every one of them, and they have not been to one in a long time. The statement that the plaintiff never points to a single regulation, again, I draw your attention to pages 30 to 36 of our brief, or 37 of our brief, including the statement that safety is a command responsibility. The commanding officer is delegated to the director or chief of each major organizational element, responsibility for the safety of all personnel assigned to or working on projects under his direction. He is also responsible for the maintenance of adequate precautions for protecting the surrounding community from substances which employees under his supervision are working. So that hasn't taken place. They were told exactly how to do it. They were told exactly why they were doing it. And then since 1997, they haven't done anything. And that's where the injuries are continuing. Some of these folks were exposed before 1997, but people are exposed there today. Right this minute, there are people. I don't know if you've seen or if the court has taken a look at the physical layout that we're talking about, but Area B is separated from a tremendous neighborhood by one narrow street and a chain-link fence. And it's what's going under that chain-link fence, under that street, and under those homes. It's killing, literally killing people. There are 1,300 reported cancers within a mile of this base. And the government has just stopped its responsibility and said, we've done enough. Are they allowed to make that judgment? No, they're not allowed, not without penalty. Not once the directives and all of the- You're saying the government has stopped. Is it violating the law in stopping, or has it said, we've done what we're going to do? It's violating the law because they- What law? The government has made a judgment that it's cleaned it up to the extent it can. It's put people on water, eliminated the wells. And if they're not, I don't know if they're doing that because that goes to whether they're negligent or not causing injury and so forth. But that's not the issue before us. The issue before us is they keep making judgments about this, and you keep challenging the judgments as unconscionable. And they may be. I don't know. I don't know if we have to make that judgment call. But what we're focusing on, what we have to focus on, is whether you're attacking the policy and judgment of the government in handling this site. What we're attacking the government for is not handling the site, not doing anything since 1997. And, yes, there is a law. There's the Clean Water Act that they've stepped outside of and just said, we've done enough. And they haven't done enough. They did something, and they got to a point where it cost them $25 million to pull some dirt out of there, stick it on trucks, and send it probably to New Jersey. They seemed to get everything anyway. I don't know where it went from there. But they took everything out of the ground up to $25 million worth and said, geez, this is going to cost us like almost a billion dollars to do the rest. But guess what? Rocky Flats, Colorado, they spent over a billion dollars cleaning that up. And this, Rocky Flats was a, Rocky Mountain Arsenal, I'm sorry, was a tremendously polluted area doing the same exact work and received all sorts of attention. But this facility is classified by the EPA as a Level 4 polluted facility. There's no Level 5. This is as bad as it gets in the United States of America. And this court is being implored not to allow this to continue where the government does nothing to help to protect the lives of these people. Thank you. Thank you. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, Robert B. King, Pamela A. Harris